

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-22-00024-CR

HUMBERTO ORTIZ BALDERAS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 28545

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef
Memorandum Opinion Concurring In Part and Dissenting In Part by Justice Rambin

# MEMORANDUM OPINION

After a jury found Humberto Ortiz Balderas guilty of continuous sexual abuse of a young child (Count I), indecency with a young child by exposure (Count III), and two counts of sexual assault of a young child (Counts IV and V),[1] the trial court sentenced him to confinement in prison for thirty years, five years, ten years, and ten years, respectively. The trial court ordered Balderas's sentences to run consecutively. Balderas appeals, maintaining that (1) the evidence was insufficient to support his conviction for continuous sexual abuse of a young child, (2) the trial court's jury instructions contained error causing him egregious harm, (3) the trial court erred by bolstering the State's case when it read back testimony to the jury during its deliberations, and (4) the trial court's judgments of conviction contained factual errors.

Because we find that there was insufficient evidence to support Balderas's conviction for continuous sexual abuse of a young child, we reverse the trial court's judgment of conviction as to Count I.[2] Further, we sustain Balderas's third point of error and reverse the judgments of conviction as to Counts III, IV, and V. Finally, with the exception of Count I, we remand to the trial court for a new trial consistent with this opinion.[3]

---

[1]Based on the guilty verdict as to Count I, the trial court instructed the jury not to consider Count II, which was a charge of aggravated sexual assault of a child. Count II was essentially subsumed by the jury's guilty verdict to Count I. *See* TEX. PENAL CODE ANN. § 21.02(f) (Supp.).

[2]Because we find that the State did not meet its burden of sufficiently showing that P.S. was less than fourteen years old when Balderas committed the second alleged predicate offense, we do not find it necessary (1) to address, at length, Balderas's remaining sufficiency argument relating to his conviction of continuous sexual abuse of a young child or (2) to address his second point of error that the trial court's jury instructions as to the offense of continuous sexual abuse contained egregious harm.

[3]Because we sustain Balderas's third point of error, we find it unnecessary to address his fourth point of error.

## I.    Background

At trial, twenty-two-year-old P.S. testified that her mother, G.S., met Balderas online when G.S. was living in Mexico and Balderas was living in the United States. When P.S. was around eight years old,[4] her mother decided to move the family to Paris, Texas, where they lived with Balderas in a green house on East Washington Street (the green house). According to P.S., they lived in the green house from the time she was in third grade, around 2008, until she became a freshman in high school, around 2014. After that, they moved to a house on Polk Street in Paris, Texas, which P.S. described as a red brick home (the red house). P.S. explained that they lived in Paris the entire time, except for the summer of 2011 or 2012 when G.S. and Balderas separated and G.S. took her family to live in Houston.

P.S. explained that, during the time they lived in the green house, Balderas was "basically [her] father figure." According to P.S., Balderas support[ed her] all the time," and for the most part, they did not fight or have disagreements while they lived in the green house. Yet, after G.S. and P.S. returned to Paris from Houston in 2011 or 2012, and while they were still living in the green house, Balderas began touching P.S. P.S. testified that, one day, while she was on the telephone crying because she wanted to return to Houston, Balderas "whisper[ed] to [her] so softly . . . [a]nd he then proceeded to open [her] legs and he used his finger and . . . he started touching [her] and [she] didn't know what was going on so he said it's okay, todos tambien

---

[4]P.S. was born in June 1999.

3

(phonetic), like he was trying to calm [her] down." In an effort to be more specific, P.S. said that Balderas touched her vagina with his finger "[w]here [her] clitoris [was] at."[5]

P.S. also explained that there had been a room in the green house that the family referred to as a basement, and it was the room in which they did laundry.[6] P.S. said that, on her way to do laundry, Balderas "would stop [her] at the top of the steps[,] and he would feel on [her] and touch [her]." P.S. stated that Balderas would stretch her pants and then put his finger inside and outside of her vagina. P.S. said that Balderas had sexually abused her at other times while they lived in the green house but that her memory about those instances was "vague."

When P.S. was almost fifteen years old, the family moved to the red house. According to P.S., the abuse at the red house had become a "constant thing, every Sunday from 9:00 to 5:00, because [her] mom worked from 9:00 to 5:00." P.S. said that the ongoing abuse began her junior year of high school and that it did not stop until she left for college. While living in the red house, Balderas would "feel upon [her]," even when the family was there. P.S. said that, if she was menstruating, Balderas would masturbate behind her and that she could "fe[el] his penis by [her] butt." Balderas would ground P.S. because she did not clean herself "down there good enough[.]" P.S. said that she purposefully stopped cleaning herself to discourage Balderas's abuse.

When P.S. was fifteen, Balderas taught her how to drive a car. According to P.S., Balderas would take her driving on the "back" roads. On one occasion, Balderas told P.S. that

---

[5]We will refer to this alleged assault as the first predicate offense.

[6]At some point, P.S. began using the room as her bedroom.

she had "to be able to focus on the road all the time, no matter what happen[ed]." Balderas then masturbated while P.S. was driving. After the driving lesson was over and the pair had gone back to the red house, Balderas told P.S. "to lay down on the pool table and open [her] legs, and that was the first time he gave [her] oral and put his tongue in [her] vagina."

In 2018, during her first semester of college, Balderas called P.S. while she was participating in a Bible study. P.S. said Balderas was "flipping out about something." After she discontinued the telephone call, Balderas repeatedly texted P.S., making her cry. When P.S. left the Bible study, she contacted her roommate, who was the "only person that [she] could trust[,]" and P.S. told her about the abuse that she had suffered. Even at that point, P.S. did not file a police report because it was "hard to separate [the] abuser from a dad figure." P.S. eventually went to see a college counselor because she needed to talk with someone about the abuse so that she could "let it out." Despite her counselor's encouragement, P.S. still did not report the abuse to law enforcement.

Around the middle of July 2019, P.S. informed her mother that she had been abused by Balderas "ever since [she could] remember." P.S. said that her mother was in shock and began crying. According to P.S., her mother said, "[E]verything makes sense now." That same day, P.S. made her first police report regarding Balderas's abuse.

After making the police report, P.S. spoke with an investigator who had her contact Balderas by telephone; the officer recorded their conversation. During the call, P.S. told Balderas that she had told her mother about Balderas sexually abusing her. According to P.S., she asked Balderas if he was aware of what he had done to her, and he responded, "[Y]es, yes

(inaudible)." P.S. said that Balderas never denied that he abused her. P.S. explained that, when she asked Balderas why he treated her that way, Balderas told her that her "version of a dad [was] wrong[.]" She continued, "He said the way he loved me was his way."

Eventually, P.S. sought counseling. On May 2, 2019, when P.S. was nineteen years old, she reported to her counselor that Balderas began sexually abusing her when she was around twelve years old and that he stopped abusing her when she was around eighteen years old. P.S. had been diagnosed with post-traumatic stress disorder, clinical depression, anxiety, and attention-deficit/hyperactivity disorder, and as a result, she had been taking medication for two years.

Balderas flatly denied the State's allegations that he sexually abused P.S. According to Balderas, P.S. made the accusations against him because she was angry with him for providing her with a bicycle, rather than a vehicle, for transportation while she was away at college.

## II. Discussion

### A. Sufficiency of the Evidence

In his first point of error, Balderas maintains that the State failed to present legally sufficient evidence to prove beyond a reasonable doubt that he was guilty of continuous sexual abuse of a young child. We agree.

#### 1. Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297

(Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* at 297 (quoting *Hooper*, 214 S.W.3d at 13). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as

7

the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13).

"Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004))). "Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* at 297–98 (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018) (citing *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004))).

### 2. Analysis

In order to obtain a conviction for continuous sexual abuse under Section 21.02 of the Texas Penal Code,[7] the State was required to establish beyond a reasonable doubt that, between July 30, 2011, and continuing until on or about June 27, 2013, Balderas, (1) who was seventeen years of age or older at the time of the alleged offense, (2) committed two or more acts of sexual

---

[7]Section 21.02(b) states, in part, that a person commits the offense of continuous sexual abuse of a child when

      (1)    during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts are committed against one or more victims; and
      (2)    at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is:
            (A)    a child younger than 14 years of age, regardless of whether the actor knows the age of the victim at the time of the offense; or
            (B)    a disabled individual.

TEX. PENAL CODE ANN. § 21.02(b) (Supp.).

abuse against P.S., a child younger than fourteen years of age, (3) "during a period that [was] 30 or more days in duration." *See* TEX. PENAL CODE ANN. § 21.02 (Supp.). The predicate offenses alleged that, on four separate occasions, Balderas sexually assaulted P.S. by intentionally or knowingly causing the penetration of P.S.'s sexual organ with his finger when she was younger than fourteen years old. Balderas contends that the State failed to prove (1) that he committed two predicate offenses against P.S. when she was younger than fourteen and (2) that those two predicate offenses occurred at least thirty days apart.

At trial, P.S. testified, and the evidence showed, that Balderas committed the first predicate offense in the green house sometime in 2011 or 2012, making P.S. twelve or thirteen years old at the time of that assault.

When asked whether Balderas sexually assaulted her at any other time when the family lived in the green house, P.S. stated,

> Yes. . . . [I]t's like a basement/room and that was my -- that became my room. I lived in the living room for a while, like that was my room when we got back from Houston. . . . Whenever I went to go do laundry or I was going down there he would stop me at the top of the stairs.

P.S. said that Balderas "would feel on [her] and touch [her] "[Balderas] would . . . stretch [her] pants and put his hand" inside and outside of her vagina. Consequently, P.S.'s testimony supported a finding that Balderas committed the second predicate offense in the green house. However, the State was also required to prove that P.S. was younger than fourteen at the time the second predicate offense occurred.

9

To support a conviction for continuous sexual abuse of a young child, the State was not required to prove the exact dates of the sexual abuse, but it was required to show that two or more acts of sexual abuse occurred when the victim was less than fourteen years old and "during a period that is 30 or more days." TEX. PENAL CODE ANN. § 21.02(b)(1), (2); *Garner v. State*, 523 S.W.3d 266, 271 (Tex. App.—Dallas 2017, no pet.) (citing *Baez v. State*, 486 S.W.3d 592, 595 (Tex. App.—San Antonio 2016, pet. ref'd)). In addition, although the jury is not required to agree on which specific acts were committed by the defendant or the dates on which they occurred, it must unanimously agree that the defendant committed "two or more acts of sexual abuse during a period of thirty days or more." *Id.*

> Citing *Dixon*, the State points out that courts have been cautioned not to
>
> impose unrealistic expectations regarding proof of when an offense actually occurred: "[I]t is not often that a [young] child knows, even within a few days, the date that she was sexually assaulted. And, the younger the child, the greater the possibility" that she will be uncertain about the timing of the offense.

*Dixon v. State*, 201 S.W.3d 731, 736 (Tex. Crim. App. 2006) (first alteration in original) (quoting *Sledge v. State*, 953 S.W.2d 253, 256 n.8 (Tex. Crim. App. 1997)).

Clearly, a young child should not be required to recall, or to testify to, the exact dates of her sexual abuse. But, as the Texas Court of Criminal Appeals also explained in *Dixon*, we should consider the extent of a child victim's memory in relationship to a child victim's age. In *Dixon*, the child was six years old at the time the sexual abuse was alleged to have occurred, and she was seven years old at the time she testified at trial. *Id.* at 731. Here, P.S. was around twelve or thirteen years old when the abuse began. She was twenty-two years old at the time she

10

testified at trial. Consequently, although P.S. was not required to testify to the exact dates of abuse, she was required to provide a more detailed version of events than that of a seven-year-old child.

In their briefing and during oral argument, both parties used, as a temporal reference, the period during which the family lived in the green house and the period during which the family lived in the red house. At trial, P.S. testified as to when the family moved into the red house:

> Q.  So, at some point ya'll moved over to the [red] brick house, right?
>
> A.  Yes.
>
> Q.  Okay. Do you remember what grade that was in?
>
> A.  It was going from the eighth grade to freshman year.
>
> Q.  All right. So do you remember how old you were at that point?
>
> A.  I was about to turn 15.
>
> Q.  About to turn 15?
>
> A.  Uh-huh.

In support of its contention that it proved beyond a reasonable doubt that Balderas committed the second predicate offense before P.S. turned fourteen, the State directs us first to P.S.'s testimony that the family moved to the red house when she "was almost 15 years old" and that "the abuse occurred more frequently." According to the State, that testimony, combined with P.S.'s testimony that the assaults occurred in the green house at "other times" necessarily showed that P.S. was younger than fourteen when the second predicate offense occurred. The State, however, discounts the fact that P.S. had been fourteen for almost a year *prior* to leaving

11

the green house.  The question is whether the jury could have properly inferred (1) that, because P.S. lived in the green house during a time when she was less than fourteen years old, Balderas committed the second predicate offense when she was younger than fourteen and (2) that those two predicate offenses occurred at least thirty days apart.

In *Hooper*, the Texas Court of Criminal Appeals explained that juries are permitted "to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial.  However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions."  *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007).  The court went on to clarify the difference between an inference and a conclusion based on speculation:

> [A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them.  Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented.  A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.
>
> As stated above, juries are permitted to draw multiple reasonable inferences from the evidence (direct and circumstantial), but they are not permitted to draw conclusions based on speculation.  Without concrete examples, it can be difficult to differentiate between inferences and speculation, and between drawing multiple reasonable inferences versus drawing a series of factually unsupported speculations.[8]

---

[8]To illustrate the difference between the two, the court posed the following hypothetical:

> A woman is seen standing in an office holding a smoking gun.  There is a body with a gunshot wound on the floor near her.  Based on these two facts, it is reasonable to infer that the woman shot the gun (she is holding the gun, and it is still smoking).  Is it also reasonable to infer that she shot the person on the floor?  To make that determination, other factors must be taken into consideration.  If she is the only person in the room with a smoking gun, then it is reasonable to infer that she shot the person on the floor.  But, if there are other people with smoking guns in the room, absent other evidence of her guilt, it is not reasonable to infer that she was the shooter.  No

12

*Id.* at 16.

> Inference stacking is not an improper reasoning process; it just adds unnecessary confusion to the legal sufficiency review without adding any substance. Rather than using language of inference stacking, courts of appeals should adhere to the *Jackson* standard and determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.

*Id.* at 17.

The State relies on P.S.'s testimony that Balderas abused her almost *every Sunday*, which could have, in theory, meant that Balderas sexually abused her on a Sunday when she was younger than fourteen years old. But immediately before that testimony, the State asked P.S., "So was there anything that happened while you were at the [*red*] *brick house*?" (Emphasis added). P.S. answered, "Yes." She then went on to explain, "So there were -- it became like a constant thing, every Sunday from 9:00 to 5:00, because my mom worked from 9:00 to 5:00." "And there's times -- every Sunday I started having to wear heels and a skirt." P.S. testified that she was fourteen, "about to turn 15," at the time she moved into the red house. Consequently, P.S.'s testimony that Balderas sexually abused her almost "every Sunday" after she had moved

---

rational juror should find beyond a reasonable doubt that she was the shooter, rather than any of the other people with smoking guns. To do so would require impermissible speculation. But, what if there is also evidence that the other guns in the room are toy guns and cannot shoot bullets? Then, it would be reasonable to infer that no one with a toy gun was the shooter. It would also be reasonable to infer that the woman holding the smoking gun was the shooter. This would require multiple inferences based upon the same set of facts, but they are reasonable inferences when looking at the evidence. We first have to infer that she shot the gun. This is a reasonable inference because she is holding the gun, and it is still smoking. Next, we have to infer that she shot the person on the floor. This inference is based in part on the original inference that she shot the gun, but is also a reasonable inference drawn from the circumstances.

*Hooper*, 214 S.W.3d at 16.

to the red house is immaterial to our analysis because she was at least fourteen years old at that time, almost fifteen.

P.S. testified that, in 2011 or 2012, while she was on the telephone, Balderas touched her vagina with his finger "[w]here [her] clitoris [was]." P.S. described (1) the time frame in which the abuse occurred (when she was younger than fourteen), and (2) the manner in which it happened. Accordingly, we agree with the State that the evidence at trial established that one of the predicate offenses occurred. However, to prove a second predicate offense, the State directs us to P.S.'s testimony that, while she lived in the green house, Balderas sexually abused her "*at other times*." The term "at other times" is exceedingly general in nature and, consequently, did not provide a basis for the jury to rationally infer that P.S. was younger than fourteen when Balderas committed the second predicate offense.[9] This is so because P.S. testified that she moved to the red house when she was almost fifteen years old. That necessarily means that, for almost a year, P.S. was fourteen years old during the time she lived in the green house. Without more, P.S.'s testimony that Balderas sexually assaulted her "at other times" did not provide a basis to rationally infer that she was younger than fourteen at the time of the second predicate offense.

Moreover, P.S.'s testimony that Balderas "sexually abused" her while the family lived in the green house does not provide a basis to rationally infer that Balderas committed the second

---

[9]The same is true of the State's burden of proving that thirty days had elapsed between the time the first predicate offense occurred and the second predicate offense occurred. Thirty days may have indeed elapsed between two instances of sexual abuse, but only by speculating as to the meaning of "at other times" could the jury have determined, or even inferred, that Balderas committed the second predicate offense at least thirty days after the first predicate offense

predicate offense, that is, penetrating P.S.'s genitalia by using his finger. Nor does it provide a basis to infer that P.S. was younger than fourteen at the time of a second predicate offense. Balderas was charged with sexually abusing P.S. in a variety of other ways, including indecency with a child by exposure and sexual assault of a child by intentionally or knowingly causing P.S.'s sexual organ to contact Balderas's mouth. Yet, those assaults did not make up the underlying basis of the alleged predicate offenses with which the State specifically charged Balderas, that is, aggravated sexual assault of a child by using his finger to penetrate P.S.'s sexual organ. At best, P.S.'s testimony that Balderas "sexually abused" her created only a suspicion of a fact regarding proof of the second predicate offense and, therefore, was insufficient to support a conviction of continuous sexual abuse of a child.[10]

We sustain Balderas's first point of error.[11]

Generally, when we find "the evidence insufficient to establish an element of the charged offense, but the jury necessarily found the defendant guilty of a lesser offense for which the evidence is sufficient," we should "reform the judgment to reflect the lesser-included offense and remand for a new punishment hearing." *Lee v. State*, 537 S.W.3d 924, 927 (Tex. Crim. App.

_____

[10]In its appellate brief and during oral argument, the State maintained that P.S.'s age, as well as proof that the two predicate offenses occurred at least thirty days apart, were "immaterial" elements of the charged offense. We disagree. Proof of those two elements is what differentiates the offense of continuous sexual abuse of a child and the offense of aggravated sexual assault of a child. However, because we find that the State did not meet its burden of sufficiently showing that P.S. was less than fourteen years old when Balderas committed a second alleged predicate offense, we do not find it necessary to discuss, at length, whether the State proved beyond a reasonable doubt that Balderas committed two separate predicate offenses against P.S. and that those two predicate offenses occurred thirty days apart from one another. That said, we conclude that the State did not meet its burden.

[11]Because we find that the State did not present sufficient evidence to support a guilty verdict as to continuous sexual abuse of a child, we need not address Balderas's second point of error—that the trial court's jury instructions as to the offense of continuous sexual abuse contained egregious error.

2017) (citing *Thornton v. State*, 425 S.W.3d 289, 299–300 (Tex. Crim. App. 2014)). In this case, there was sufficient evidence to find Balderas guilty of aggravated sexual assault of a child.[12] Yet, our holding on issue three prevents us from modifying the judgment to reflect a conviction of the lesser-included offense.

### B. Whether the Trial Court Unfairly Bolstered the State's Case

Article 36.28 of the Texas Code of Criminal Procedure states, in part, "[I]f the jury disagree[s] as to the statement of any witness[,] they may, upon applying to the court, have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, and no other." TEX. CODE CRIM. PROC. ANN. art. 36.28. In his third point of error, Balderas contends, among other things, that the trial court erred by reading back testimony to the jury during its deliberations, which, according to Balderas, resulted in "unfairly and unnecessarily bolstering the State's case."

#### 1. The Jury's Notes

In its first jury note, the jury stated, "We would like to see English translations of the call between [Balderas] and his daughter and the English translation of the interview between Officer Bean and [Balderas]." The trial court responded, "The Court can only provide you with documents admitted as evidence. Neither translation was admitted as evidence."

---

[12]Section 22.021(a) of the Texas Penal Code provides that a person commits aggravated sexual assault of a child if the person intentionally or knowingly causes the penetration "by any means" of the anus or sexual organ of a child younger than fourteen years of age. TEX. PENAL CODE ANN. § 22.021(a)(1)(A)(i), (a)(2)(B). Here, the evidence was sufficient to show that, on or about June 27, 2012, Balderas intentionally or knowingly used his finger to penetrate P.S.'s sexual organ and that P.S. was younger than fourteen years old at the time he committed that offense.

16

In its second note, the jury asked, "Can we review the court reporters record of the testimony by the officer [(Ramirez)] who translated the call between [P.S.] and Mr. Balderas?" The trial court responded, in part, "In accordance with the Court's instructions, it is necessary that the Jury identify the disputed testimony. A general request for a witness's testimony is insufficient. Please specify your dispute so the Court can locate the relevant testimony."

In its third note, the jury stated, "In the phone call between Mr. Balderas and [P.S.], there was testimony that at one point in the call Mr. Balderas answered Yes, Yes to a question [P.S.] asked him. We would like to hear [the] translation of what [P.S.] asked him that he answered yes, yes, to." Outside the presence of the jury, the trial court addressed the parties, stating, "Now, granted in this third note they do not identify the witness. But they have specified what the dispute is over. The dispute is over what [P.S.] asked him. So the Court is inclined to reply that they have to identify which witness' testimony they want to hear from." The State had no objection to the proposed response, but Balderas objected, arguing,

> We don't feel that it's reached the point that any further comment other than you have all the law contained in the charge as a comment, and it's more confusing. We would ask simply that the Court respond you have all the law contained in the charge, please refer to that. That would be -- we would object to anything further. Anything further delineating out specific things we believe is a comment potentially on the evidence and we would just ask the Court to refer them to the charge that contains the law.

Yet, before the trial court sent a response back to the jury, it received a fourth note, which stated, "Were officer Bean's notes surrounding his interrogation of Mr. Balderas admitted to evidence, and if so can we review those notes of the interogation [sic]?" In addressing the third and fourth notes, Balderas stated,

17

I would just add, Judge, based on the context of the fourth note it appears to the Defense that they're just asking for testimony without generating any -- or notifying the Court of any dispute. It's pretty clear in this fourth note they just want additional testimony or evidence that's not in evidence. We would submit to the Court that is what note 3 is as well. They haven't generated and said we are in dispute as to given the exact dispute as to what person and what conversation it was. Without that we don't think it can be answered any way but than to say you have all the law contained in the charge, without the Court commenting on or directing them to a particular area. They have the law. The Court has been specific with them. They were told that by the State. We feel anything further is outside.

The trial court then informed the parties, "The Court's response to note 3 will be: You are required to identify the witness or witnesses from whom you wish to hear." The State had no objection to the trial court's response to the third note, and Balderas renewed his previous objection. Next, the court stated, "Then note 4, which was Officer Bean's notes, the request for those if they were admitted, the Court is replying: The requested item was not admitted into evidence." Neither party had an objection to the trial court's response to the fourth note.

The court then received a fifth note from the jury, which stated, "We wish to hear from officer Ramirez about what [P.S.] asked Mr. Balderas that answered yes-yes, (Si Si) to[.]" The trial court and the parties then reviewed the transcript of the requested testimony. The court explained, "Officer Ramirez answered she says are you aware what you did to me, he's like yes-yes. That is relevant testimony. I will bring the jury back in and we'll read that testimony to them." Balderas objected, "I cross[-]examined after that and the full answer in my notes that Officer Ramirez said when I asked him [what] it was she said -- he said yes-yes and I said something but that's not the end of it." Balderas continued,

18

> The yes-yes is not a complete translation of what was said. It leaves an unfair answer because it's not what his full answer was. Again, it's our position that the note that you plan to answer they did not put in that note anywhere that there's a dispute about that. They're just asking for some testimony so we shouldn't even be doing this is the Defense's contention.

Balderas went on to explain his reasoning, stating that, after he said, "[Y]es-yes," to P.S.'s question, he immediately followed with, "that's what you say." The State responded that the jury had asked about the contents of P.S.'s question that prompted the response of "yes-yes[,]" but not what Balderas's response to the question had been. The court stated that it was "inclined to read and strictly construe their notes. Their note clearly asks what did [P.S.] ask Mr. Balderas that he answered yes-yes to. Your objection is noted."

Before the jury returned to the courtroom, the court received and discussed a sixth jury note with the parties. The question read, "Can we hear [P.S.]'s question or statement to Mr. Balderas immediately before she asked[,] 'Are you aware what you did to me' and he answered Yes-Yes." After the court noted that the jury did not identify the witness, it said, "But, let's just assume they're talking about Officer [Ramirez]." The court then reiterated that Balderas asked P.S. if she was aware of the steps that she was taking against him, and P.S. said, "[Y]es," she was aware. Then P.S. asked Balderas if he was aware of what he had done to her and Balderas responded, "[Y]es, yes." The court asked Balderas whether he believed the jury had complied with the court's instructions in terms of identifying a witness and the dispute regarding that witness's testimony. Balderas repeated his prior objection, arguing (1) that the jury had not identified a witness, (2) that it had not pointed to a dispute but was merely asking for the trial court to read back testimony, and (3) that the trial court's proposed response, without

more, was incomplete and misleading. The court agreed with Balderas, stating that it would instruct the jury to refer to the court's response to the second note, that is, that the jury was required to advise the court of a dispute.

Neither party objected to the trial court's proposed response to the sixth note.

The jury then sent a seventh note, which read, "We would like to hear Officer Ramirez' testimony and translation of [P.S.]'s question or statement to Mr. Balderas immediately before she asks are you aware of what you did to me." In response, the State argued, "I understand the note as them being uncertain as to whether -- what immediately proceeded [sic] that was a question or statement and they're just trying to cover whatever the last thing she said before the question was." The trial court replied, "Are you serious? Let's wait and see what they have to say in note 8."

The trial court stated,

They write: Can we hear Ramirez' translation of the call between [P.S.] and Mr. Balderas from the point Balderas initially answers the phone to the point he answer[s] si-si, to [P.S.]'s question are you aware of what you did to me. So essentially they're asking for everything from the time he picks the phone up until he answers are you aware what you did to me si-si. I don't think it's a lot of testimony."

After a brief break, the trial court returned to the bench and explained,

I think the Court does find there is a dispute. There is a factual dispute within the jury as to the contents of that telephone call. So they don't have to use a specific word saying that there is a dispute, just -- I can infer from the progression of notes. And I've got plenty of them now. I think it's quite clear that there is a factual dispute as to what's in the phone call.

The main reason behind 36.28 is to make sure the Court doesn't comment on the weight of the evidence, in other words cherry pick things. I think their

20

request is quite clear. They have limited it in scope, from the time the phone is picked up until the time that question is asked.

The court asked if either party had an objection, to which the State explained that it might help to ask the jury "how many lines of testimony or pages because obviously if it's 5 to 6 lines of testimony that's far different than 50 or 60, just to help identify it is that, actually, narrow in scope." Once again, Balderas objected, stating that the jury had not identified a specific dispute and that reading only Balderas's answer ("si-si") to P.S.'s question, without reading his testimony immediately following "si-si," was misleading, incomplete, and taken out of context.

At that point, the trial court sent a note to the jury in response to the seventh note, stating that the jury should continue deliberating and that the court would provide a response shortly to the seventh and eighth notes. After a brief recess, the trial court determined that the requested testimony was "very short" and indicated that it intended to read it back to the jury. The court noted Balderas's objections.

In response to the seventh and eighth notes, the trial court read to the jury Ramirez's translation of the recording of the telephone call between P.S. and Balderas:[13]

> Question [by the State]: Can you give us kind of a breakdown of what that was. Answer [by Ramirez]: Yes. This is going to be the phone call between the Defendant and the victim. Basically they just answered the phone, said hello. [Balderas] asked how are you. Said we are fine. Question [by the State]: Okay. Question [by the State]: Okay. What did [P.S.] or [P.S.] say at that point[?] Answer [by Ramirez]: Basically she just said that she told her mom what the Defendant had done for -- to her for eight years, everything about him coming in at three o'clock in the morning in her room and touching her, putting his fingers in her. Question [by the State]: And at that point[,] when you listened to [the recording of their conversation] the first time did you hear something that you

---

[13]The State played portions of the recording and then asked Ramirez to translate what had been said.

realized after you listened to it was a mistake[?] Answer [by Ramirez]: Yes. I initially thought he had said yes right after that statement but it was a little bit later on in the conversation. Question [by the State]: Okay. So what did - - did he say something right after [P.S.]'s statement there[?] [Answer by Ramirez:] He's just said are you okay[?] Question [by the State]: Okay. Question [by the State]: Okay. What about -- what was that little exchange[?] Answer [by Ramirez]: He's just asking her twice if she's okay and she's saying no. And then he wants to know where her mother is. He wants to know if he can know where she is at. Okay. Question [by the State]: What did -- he -- answer: He asked are you aware of the steps that you're taking and she said yes. Question [by the State]: What did she say right there[?] [Answer by Ramirez:] She said yes, I am aware. She was like are you aware. Answer [by Ramirez]: She says are you aware what you did to me and he's like yes, yes.

### 2. Balderas Did Not Waive His Point of Error for Our Review

The State argues first that Balderas failed to preserve this issue for appellate review because his point of error on appeal does not comport with his objection at trial. Complaints regarding error in the reading of trial testimony during deliberations "must be preserved by objection at the time of the reading." *Hollins v. State*, 805 S.W.2d 475, 476 (Tex. Crim. App. 1991); *May v. State*, 139 S.W.3d 93, 100 (Tex. App.—Texarkana 2004, pet. ref'd). A timely objection gives the trial court an opportunity to correct the alleged error. *Morales v. State*, 222 S.W.3d 134, 145 (Tex. App.—Corpus Christi 2006, no pet.) (citing *Martinez v. State*, 22 S.W.3d 504, 507 (Tex. Crim. App. 2000) (holding that the reason for a timely objection is to "give to the trial court or the opposing party the opportunity to correct the error or remove the basis for the objection"). The complaint on appeal must comport with the trial objection. *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014).

At trial, Balderas objected multiple times to the court's response to the jury's note because (1) there was no evidence of a dispute among the jurors, and (2) the testimony that the

court read back to the jury lacked context.  On appeal, Balderas maintains, among other things, that the trial court erred by reading back the selected testimony to the jury because it "unfairly and unnecessarily bolster[ed] the State's case."  According to the State, Balderas did not make that argument at trial.  We disagree.  Balderas argues on appeal that the trial court excluded portions of Ramirez's testimony that clearly bore on the disputed issue identified by the jury.  We interpret that to mean that the trial court bolstered the State's case when it refused Balderas's request to re-read the remainder of Ramirez's testimony, that is, "He's like I agree that's your truth."[14]  Consequently, we find that Balderas's argument on appeal comports with the objections he made at trial.

### 3.      The Trial Court Did Not Err When It Found that the Jury Identified a Factual Dispute

The Texas Court of Criminal Appeals has held that the purpose of Article 36.28 is "to balance our concern that the trial court not comment on the evidence with the need to provide the jury with the means to resolve any factual disputes it may have."  *Howell v. State*, 175 S.W.3d 786, 790 (Tex. Crim. App. 2005) (citing *Robison v. State*, 888 S.W.2d 473, 480 (Tex. Crim. App. 1994)).  If the jury asks the trial court to read back particular disputed testimony, the "court must first determine if the jury's inquiry is proper under Article 36.28."  *Brown v. State*, 870 S.W.2d 53, 55 (Tex. Crim. App. 1994).  "A simple request for testimony is not, by itself, a proper request under Article 36.28."  *Balderas v. State*, 517 S.W.3d 756, 797–98 (Tex. Crim. App. 2016) (citing *DeGraff v. State*, 962 S.W.2d 596, 598 (Tex. Crim. App. 1998)).

---

[14]"Error preservation . . . is not an inflexible concept," and its application should not be mechanically applied. *Thomas v. State*, 408 S.W.3d 877, 884 (Tex. Crim. App. 2013).

Balderas maintains that the jurors did not identify a particular disagreement regarding a witness's testimony. Article 36.29 necessitates only that the jurors disagree about a witness's testimony. But it does not require the jury to state the nature of their disagreement in a specific manner. *Howell*, 175 S.W.3d at 793 ("The statute requires that the jury disagree; it does not require that the jury use any particular words to express that disagreement."). While a simple request for testimony does not amount to a disagreement, either implicit or express, a trial court may, in its discretion, infer a dispute in a given case. *Id.* (citing *Moore v. State*, 874 S.W.2d 671, 674 (Tex. Crim. App. 1994)). "The judge's inference of dispute need only have some basis other than mere speculation." *Id.* at 792.

In *Moore*, the jury asked the trial court to read back a specific portion of testimony. *Moore v. State*, 874 S.W.2d 671, 672 (Tex. Crim. App. 1994). Moore objected, asking "the trial court [to] inform the jurors they must certify there was a dispute among them as to a particular point in the testimony." *Id.* The trial court denied the request and informed the jury that the court reporter would not be available until later. *Id.* The jury continued to wait for two hours more before sending out another note, reading, "We cannot progress any further until [the witness's] testimony is read for us. Is the court reporter here so she can read that portion of the testimony?" *Id.* The trial court then had the reporter read the requested testimony over Moore's objection that the jury had not certified the existence of a dispute. *Id.* Finding that the jury's request did not indicate a disagreement as required by Article 36.28, the Texas Court of Criminal Appeals noted that the jury's successive notes did not demonstrate a pattern of narrowing the jury's request from a global request for testimony to a specific question targeted to one witness's

24

responses during cross-examination. *Id.* at 673. Second, the trial court did not instruct the jury under Article 36.28 of the Texas Code of Criminal Procedure. *Id.* at 674.

*Robison* presents facts that more closely correspond to the facts of the case at bar. In his ninth and tenth points of error, Robison argued that the trial court, "in response to a request by the jury, provided a transcription of certain testimony in violation of Article 36.28." *Robison v. State*, 888 S.W.2d 473, 479–80 (Tex. Crim. App. 1994). During jury deliberations, the trial court received a series of three successive notes requesting evidence and testimony from trial. *Id.* at 480. The first request asked for (1) "documentation that would give time of death for each victim" and (2) "[e]vidence or transcript containing the findings of the Chief of Psychiatry at the TCOM [Texas College of Osteopathic Medicine]." *Id.* (second alteration in original). The request did not state that the jurors had a dispute over the testimony. *Id.* The trial court instructed the jury that "the law provides that if the Jury disagrees as to the testimony of any witness, they may, upon application to the [trial] Court, have read to them from the Court Reporter's notes that part of a witness' testimony on the particular point in dispute and *no other*." *Id.* The court continued, "Therefore, you are instructed if you desire to have any testimony, to notify the Court in writing of the particular part or parts of any witness' testimony which is in dispute and which you desire." *Id.* Just twenty minutes later, the jury sent a note, stating, "We respectfully request *all written* documents that were submitted into evidence be brought to us." *Id.* The trial court responded, "You have all the written documents that were submitted into evidence other than the three documents attached to this answer." The court continued, "If you are referring to oral testimony concerning a particular witness' testimony, you are instructed that

you must be specific about the oral testimony you want reproduced for you and which is in dispute." *Id.* In its third note to the court, the jury asked for a "transcript of Hatcher's [the prosecutor's] cross-examination of Dr. Price, in which Hatcher read excerpts from, the reporter of the Chief of Psychiatry at TCOM." *Id.* (alteration in original). At that point, the trial court sent the requested transcript to the jury.

Finding that the trial court had not abused its discretion by reading back the challenged testimony to the jury, the Texas Court of Criminal Appeals explained:

> Here, there were three separate requests made by the jury in determining whether a dispute existed, each becoming increasingly narrow in scope. Additionally, the trial court clearly informed the jury that testimony would be read back only in the event of a dispute after each request for information. By considering the last note requesting the testimony in conjunction with prior notes from the jury and the corresponding instructions from the trial court, it was not unreasonable to infer a disagreement among the jury regarding Dr. Price's testimony. The trial court was properly cautious in observing the competing concerns of article 36.28 of the Texas Code of Criminal Procedure.

*Id.* at 481.

In this case, the jury first sent a general request that it wanted to see the English translation of the call between Balderas and P.S. The trial court denied the request because that document was not admitted into evidence. In the second note, the jury asked for the court reporter's record of Ramirez's translation of the call. The trial court responded by instructing the jurors that they had to identify a dispute. In the third note, the jury began to get more specific with what part of the testimony they wished to hear. The jury note stated, "We would like to hear [the] translation of what [P.S.] asked [Balderas] that he answered Yes, Yes, to." After the trial court recognized that the third note had not identified a particular witness, it told the parties

26

that it believed the jury had identified a specific dispute, that is, a dispute over what P.S. asked Balderas. The trial court responded by sending a note back to the jury telling it to identify which witness's testimony it wished to hear. The fifth note was fairly specific as to what the jury wanted to hear—Ramirez's testimony about what P.S. asked Balderas before he answered, "Yes, Yes." As to the sixth note, the trial court pointed out that the jury had not designated Ramirez as the witness, so it sent a note back to the jury repeating its instruction that the jury identify a witness and a disagreement. In regard to the seventh and eighth notes, the trial court found that the jury wanted to hear Ramirez's translation of the telephone call from the beginning of the call up until Balderas said, "[S]i-si." In response, Balderas argued that, if the trial court stopped reading at "si-si," the jury would be left with an incomplete picture of the testimony. Noting Balderas's objections, the trial court found that there was a factual dispute as to the contents of the telephone call and that the jury had limited its request from the time the call began until Balderas said "si-si." The testimony was then read.

It is appropriate to consider the eight jury notes in conjunction with one another. *See id.* It is apparent from those notes that the trial court was making a significant effort to stay within the parameters of Article 36.28. After hearing from each of the parties, the court sent multiple notes instructing the jury that it could read back testimony only in the event the jury designated a dispute regarding a particular witness. Each subsequent jury note became increasingly specific in its requests. Pursuant to the court's instructions, the jury identified Ramirez, and it informed the court that it wanted to hear Ramirez's translation of the telephone call between Balderas and P.S. up to the point that Balderas said, "[S]i-si." By considering each jury note, in conjunction

27

with the subsequent notes, along with the trial court's instructions, it was not unreasonable for the trial court to infer a disagreement among the jury regarding the contents of the telephone call. "The trial court was properly cautious in observing the competing concerns of article 36.28 of the Texas Code of Criminal Procedure." *See id.* Accordingly, we cannot say that the trial court abused its discretion when it determined that there existed a dispute among the jurors regarding Ramirez's testimony relating to what P.S. asked Balderas before he answered "si-si." But that does not end our analysis.

### 4. The Trial Court's Selection of Testimony Was Error

If the trial court finds that "the jur[ors] disagree as to the statement of any witness they may, upon applying to the court, have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, *and no other* . . . ." TEX. CODE CRIM. PROC. ANN. art. 36.28 (emphasis added). Here, Balderas maintains that, even assuming the jury identified a disagreement, the trial court failed to read back Ramirez's testimony in its proper context.

As the Texas Court of Criminal Appeals has explained,

> When the jury asks the trial court to read back certain disputed testimony, the trial court judge must first determine if the jury's inquiry is proper under Article 36.28. If it is proper, the trial court must then interpret the communication and decide what sections of the testimony will best answer the inquiry. The trial court has the discretion to decide "what sections of the testimony will best answer the query, and limit the testimony accordingly." However, if a trial court reads too much or too little testimony to the jury, such a response may serve to bolster the State's case unnecessarily.

28

*Thomas v. State*, 505 S.W.3d 916, 923 (Tex. Crim. App. 2016) (citations omitted). This rule attempts to strike a balance between the trial court's responsibility to aid the jurors in resolving disputes about the evidence itself, on the one hand, and the concern that the trial court not comment on the weight of the evidence, on the other. *Balderas*, 517 S.W.3d at 797. We also apply an abuse-of-discretion standard regarding "the trial court's selection of testimony responsive to the jury's request." *Id.* (citing *Brown*, 870 S.W.2d at 56).

At trial, and on appeal, the State argued that the jury was very specific with its question, that is, the jurors had a dispute regarding Ramirez's translation of P.S.'s question to which Balderas answered, "[S]i-si,"or "Yes, Yes."[15] Specifically, in its final note, the jury explained, "We would like to hear Officer Ramirez' testimony and translation of [P.S.]'s question or statement to Mr. Balderas immediately before she asks are you aware of what you did to me." Determining that there was a dispute among the jury as to what P.S. asked Balderas that elicited his answer of "Yes, Yes," the trial court was tasked with deciding what sections of the testimony would best answer the jury's question. In response, the trial court read to the jury, in relevant part, the following testimony:

> He's just asking her twice if she's okay and she's saying no. And then he wants to know where her mother is. He wants to know if he can know where she is at. Okay. Question [by the State]: What did -- he -- answer[?] [Answer by Ramirez:] He asked are you aware of the steps that you're taking and she said yes. Question [by the State]: What did she say right there[?] [Answer by Ramirez:] She said yes, I am aware. She was like are you aware. Answer [by Ramirez]: She says are you aware what you did to me and he's like yes, yes.

---

[15]The jury notes contained both English (yes) and Spanish (si).

Article 36.28 states that, in the event there is a dispute among the jurors, the trial court may "read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, *and no other* . . . ." TEX. CODE CRIM. PROC. ANN. art. 36.28 (emphasis added). Had the trial court strictly construed Article 36.28 and the jury's request, its read-back to the jury would have ended with "[s]he said yes, I am aware" and before "[s]he was like are you aware." Instead, the trial court went further and included Balderas's answer of "Yes, Yes."[16] The trial court's reading of the testimony emphasized what appears to be a clear admission by Balderas to P.S.'s allegations of sexual abuse, it exceeded the scope of the jury's dispute, and it "serve[d] to bolster the State's case unnecessarily." *See Thomas*, 505 S.W.3d at

---

[16]Martinez testified:

>    A.    [By Ramirez] He asked are you aware the steps that you're taking and she said yes.
>
>    . . . .
>
>    Q.    [By the State] What did she say there?
>
>    A.    [By Ramirez] [He] said yes, I am aware. She was like are you aware.
>
>    . . . .
>
>    A.    [By Ramirez] She says are you aware of what you did to me. He's like yes. Yes.
>
>    Q.    [By the State] Okay.
>
>    . . . .
>
>    Q.    [By the State] Okay. What about there?
>
>    A.    [By Ramirez] "She's just saying are you aware what you did to me. He's like yes uh -- and he starts stuttering a little bit and says I am aware of what you're saying and everything. He's like I agree that's your truth.

923. For these reasons, we find that the trial court erred by not limiting the response to that portion of the testimony that was presumably in dispute.

### 5. Balderas Was Harmed by the Trial Court's Response to the Jury's Note

We now turn to the issue of whether Balderas was harmed by the trial court's response to the jury's note. In cases such as this, an appellate court applies the standard for assessing harm detailed in Rule 44.2(b) of the Texas Rules of Appellate Procedure.[17] *See* TEX. R. APP. P. 44.2(b). Under that standard, reversal is required only in the event the trial court's Article 36.28 error affected an appellant's substantial rights. "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "[A]n error ha[s] a substantial and injurious effect or influence if it substantially sway[s] the jury's judgment." *Thomas*, 505 S.W.3d at 926. "If so, or if one is left in grave doubt, the conviction cannot stand." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). However, when "the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." *Id.* at 764.

In *Thomas*, the Texas Court of Criminal Appeals explained,

[T]he harm analysis in this case should not hinge solely on the lack of contradiction between the testimony read back and the testimony not read back. A variance in what is read and what is not read could mean the error is harmful even if there was no contradiction. That is why a proper harm analysis requires a review of the entire record, including the weight of the evidence of Appellant's

---

[17]Rule 42(b) states, "Any [non-constitutional] error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b).

guilt, in order to determine whether the trial court's erroneous omission of testimony that varied from that which was read back to the jury affected Appellant's substantial rights. In assessing the likelihood that the jury's decision was adversely affected by the error, the reviewing court should consider all of the testimony and physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, and closing arguments.[18] If, after a review of the record as a whole, the appellate court can say that it "has [a] fair assurance that the error did not influence the jury, or had but a slight effect," then the error is harmless.[19]

*Thomas*, 505 S.W.3d at 927.

Here, the jury heard Ramirez's translation of P.S. asking Balderas during their recorded telephone conversation whether he was aware of what he had done to her. But the court went even further by reading back that portion of Ramirez's translation of Balderas's answer, which was "Yes, Yes." The trial court stopped at that point, choosing to omit the following testimony:

> Q. [by the State] Okay. What about there?
>
> A. [by Ramirez] She's just saying are you aware what you did to me. He's like yes uh -- and he starts stuttering a little bit and says I am aware of what you're saying and everything. *He's like I agree that's your truth.*

(Emphasis added). The court chose to not read back the uninterrupted remainder of Balderas's response to P.S.'s question, indicating that he was aware of her accusations. Having exceeded the scope of the jury's question, and by failing to read back the sentences immediately following,

---

[18]*Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *Llamas v. State*, 12 S.W.3d 469, 471 (Tex. Crim. App. 2000) ("To judge the likelihood that harm occurred, appellate courts must consider everything in the record, including all the evidence admitted at trial [and] the closing arguments . . . .").

[19]*Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (citing *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

"Yes, Yes," the court's reading to the jury amounted to an admission to the charged offenses, rather than a mere acknowledgment of her accusation.

That said, a review of the entire record shows that a major issue at trial was whether Balderas admitted or denied the accusations against him during the telephone call with P.S. First, when the State called Ramirez during its case-in-chief, Ramirez testified that Detective Chris Bean asked him to listen to the recording of the telephone call between P.S. and Balderas. Ramirez translated the call word for word, to the extent that was possible, and he was questioned at length about Balderas's response of "Yes, Yes." During cross-examination, however, Ramirez admitted that he made a mistake in translating the call. In fact, Balderas did not admit to the things he was accused of doing. Ramirez also acknowledged that Balderas had been referring to her truth. To shore up his testimony, Ramirez clarified, "[Balderas] never made the statement I did those things."

Next, the State called Bean to testify. Bean also acknowledged that Ramirez made a mistake in his translation of the telephone call between Balderas and P.S. Bean said that Balderas was adamant that he never admitted to P.S.'s accusations.

Balderas also testified in his own defense, vehemently denying that he committed sexual assault against P.S. He also testified that he did not admit to sexually assaulting P.S. during their telephone conversation and that, at the time of the call, he was unaware that their conversation was being recorded. But, after learning that it had been recorded, Balderas testified, "I told them bring the recording and let's listen to it together because that is a lie, I did not say that."

33

During its initial closing argument, the State made no reference to the telephone call and did not concede that Ramirez had made an error in the translation of the call. But Balderas highlighted those issues in his closing argument:

> On the 16th [P.S.] had him on the phone -- and then they tell her to call him. He doesn't know he's being recorded. So what happens? Officer Ramirez, God bless his heart, he just ran through it quickly. He told you that. He told the Detective Bean, wrongfully, that he had confessed to the crime. He said yes. He said don't you remember when you were touching me, you came in the middle of the night at 3:00 AM. He thought he said yes but he didn't. So Detective Bean, ah-ha, okay, so he's confessed to the crime. So they go and they talk to him, they arrest him right after that. That night they arrest him.
>
> So then they meet with him the very next day. And rightfully so, law enforcement thinks he's lying when he's denying it. Well, you confessed to it yesterday, we have it on recording. What does [Balderas] do? I absolutely did not, you bring that recording in here. You bring that recording in here because I did not confess to anything. What happens? Officer Ramirez is thinking did I make a mistake. So [Ramirez] leaves there, after [Balderas has] already been arrested, he leaves and he listens to the recording again. Lo and behold, he made a mistake. [Balderas] did not confess to the crime. He writes a supplemental report. It's in black and white, and he said I made a mistake, I made a mistake to his answer, he did not say yes.

In its response to Balderas's closing argument, the State addressed what Balderas said during the telephone call, arguing,

> And then let's think back to -- we heard that phone call right here in court earlier today and we heard Officer Ramirez give the translation right here in court today. At the beginning of the call [P.S.] describes I told them about all the years you've been abusing me, about the times you came into my room at night and were touching me. What is [Balderas]'s response on the phone? If it didn't happen what is the normal response? It is what are you talking about.
>
> . . . .
>
> When she says are you aware of what you did to me that's where he said yes, yes. You heard on the tape. Si.

After both parties closed, the trial court released the jurors and ordered them to return for deliberations the following morning.

The next morning, the trial court explained to the parties,

Today is Wednesday, January 26th. At the conclusion of the trial yesterday the jury asked to go home before they began deliberating. The Court instructed them to appear here at nine o'clock, go directly to the jury room and do not begin deliberations until everyone is present. It is now 9:13.

As the jury assembled this morning and began their deliberations they have now sent out their first note.

The record shows that the jury sent its first note to the court almost immediately after they began their deliberations. The jury sent its last note around 11:15 a.m., and a few minutes later, the trial court responded to the jury's last note. Less than an hour after that, the jury reached a guilty verdict. In sum, the jury spent approximately three hours in deliberations, the vast majority of which was spent sending notes to the court, all of which involved the same issue. Moreover, once the jury received the trial court's response, it found Balderas guilty of Counts III, IV, and V in a matter of minutes.

Importantly, there was no physical evidence in this case to support the State's allegations against Balderas, nor were there any eyewitnesses to the alleged offenses, other than P.S. Consequently, P.S.'s credibility was a necessary part of the State's proof, and Balderas's credibility was at the very heart of his defense. It is true that the jury heard Balderas assert his innocence when he testified at trial, so it could be argued that the trial court's failure to read back what amounted to a denial of the allegations did not cause Balderas any harm. But when the jury

heard the trial court's read-back of Balderas seemingly agreeing to P.S's accusations during their telephone call—at a time when Balderas was unaware that a third party was listening and when he was more likely to be truthful—that incomplete re-reading of the testimony had the potential to destroy Balderas's credibility at trial when he denied the allegations against him. Further, the trial court's failure to read Balderas's entire answer reaffirmed the State's rebuttal argument, which left an inaccurate impression with the jury and was the last comment on the testimony that the jury heard before returning its verdict.

Having reviewed the entire record, we cannot say that we have a "fair assurance that the error did not influence the jury, or had but a slight effect." *See Thomas*, 505 S.W.3d at 927.

We sustain Balderas's third point of error.

## III.    Conclusion

Because we find that there was insufficient evidence to support Balderas's conviction for continuous sexual abuse of a young child, we reverse the trial court's judgment of conviction as to Count I and render a judgment of acquittal as to that count. Further, we sustain Balderas's third point of error, and reverse the judgments of conviction as to Counts III, IV, and V. Finally, we remand Counts II, III, IV, and V to the trial court for a new trial consistent with this opinion.[20]

Charles van Cleef
Justice

---

[20]Because we sustained Balderas's first and third points of error, we find it unnecessary to address his second and fourth points of error.

36

## MEMORANDUM OPINION
## CONCURRING IN PART AND DISSENTING IN PART

For reasons expressed by the majority in Section II, subsection B, I agree that the trial court's incomplete read back of Balderas's answer (as testified to by Officer Ramirez) requires reversal under the *Thomas* standard for harmful error. *Thomas*, 505 S.W.3d at 927.

I share in the assessment that the phone call was a key issue from beginning to end.

Officer Ramirez initially translated Balderas's answer as though it ended with "Yes, yes." Relying on that translation, the lead investigator in this case, Officer Bean, questioned Balderas on the mistaken belief that Balderas had confessed in the phone call. In that questioning, though, Balderas was adamant that he had not confessed and that he had said more. Balderas asked that the recording of the phone call be played back. After re-listening to the phone call, Officer Ramirez revised his translation. At trial, Officer Bean was cross-examined about this sequence of events. Officer Bean conceded that he would have preferred to have had an accurate and complete translation before interviewing Balderas.[21] The testimony of Officer Bean was just one

---

[21]The testimony was as follows:

> Q.   There was a mistake made in the translation before [Officer Bean] interviewed Mr. Balderas?
>
> A.   What are --
>
> Q.   From Officer Ramirez?
>
> A.   I believe -- my memory was that he had made -- initially made a mistake in the phone call translation I believe.
>
> Q.   Yeah, that's what I'm referring to.
>
> A.   Yes.

of several occasions where, at trial, the jury heard testimony about the translation's completeness, or lack thereof. In the State's concluding address to the jury, however, the State—much like Officer Ramirez's initial translation—focused on some, but not all, of what Balderas said in the phone call—"When she says are you aware of what you did to me that's where he said yes, yes. You heard on the tape. Si." After the State's concluding address, the jury selected a foreperson and, given that it was nearing 5:00 p.m. on January 25, the jury opted to go home and to begin their deliberations on the morning of January 26. It was on the morning of January 26 that the flurry of jury notes began.

This matters in the harm analysis, because of the primacy and recency effects: "What we hear first and last is what we are most likely to remember." Sherri A. Evans et al., *How We*

---

. . . .

Q. And he [Balderas] was pretty adamant that was not true. Mr. Balderas even said -- offered for you to bring the tape in. He was told there was a tape of it and he offered you to bring it in here, listen to it, that's not true. I never said that, words to that effect. I'm paraphrasing.

A. Yes.

Q. Okay. You never did that? You never played the tape for him?

A. No, I did.

Q. Did you suggest to Officer Ramirez to go relisten to that tape?

A. I don't recall how the timeline on that was. I know that when he initially listened to it and then he listened to it a second time that's when he caught what could've been a mistake in his translation I believe. But I don't know if I suggested to him or he just did that on his own.

Q. That's kind of a big thing, right? Questioning a suspect based on wrong information? You would have preferred to have the correct version when you talked to Mr. Balderas?

A. Yeah, sure. You would prefer to have exact information. Yeah.

*Make Decisions: Neuroscience and Heuristics*, STATE BAR OF TEXAS 43RD ANNUAL ADVANCED FAMILY LAW CONFERENCE, 2017 TXCLE-AFL 34.1 IV, 2017 WL 8316545 (2017). That said, it could be that the jury, having heard all the testimony in the case (including testimony about Officer Ramirez's initial, and then revised, translation) could have decided to believe some ("yes, yes") but not all ("that's your truth") of what Balderas said. Were we looking at this question through a sufficiency lens, the conclusions to draw from the evidence would be the jury's call to make.[22] Indeed, accepting some, but not all, of Balderas's answer is the call that the State's concluding remarks implicitly invited the jury to make. But in Section II, subsection B, of the majority opinion, we are <u>not</u> looking at what *conclusions* the jury may draw *from* the evidence, we are looking at the *presentation* of the evidence *to* the jury via the read-back of the testimony. That read-back is evaluated through the lenses of the "and no other" mandate of Article 36.28 of the Texas Code of Criminal Procedure, TEX. CODE CRIM. PROC. ANN. art. 36.28, and the *Thomas* harm standard: "fair assurance that the error did not influence the jury, or had but a slight effect," *Thomas*, 505 S.W.3d at 927 (quoting *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002)).

The State's concluding remarks on the late afternoon of January 25 did not in so many words urge the jury to decide that "that's your truth" could be disbelieved because what really mattered was "yes, yes." Instead, the State modeled this mindset for the jury by the State's action of ignoring "that's your truth" when describing the contents of the call as though all that

---

[22]"Because the jury is the sole judge of a witness's credibility, and the weight to be given the testimony, it may choose to believe some testimony and disbelieve other testimony." *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008).

was said was "yes, yes." Given that context, I agree that the limited read-back was harmful. I agree that there should be a new trial.

Where I differ with the majority opinion is that, in my view, the new trial should include the continuous sexual abuse of a child charge. *See* TEX. PENAL CODE ANN. § 21.02. The majority opinion states that there was insufficient evidence to support the jury's verdict on that charge. I believe the evidence was sufficient, if barely so. Which is to say that my disagreement with the majority is slight.

I do, however, comment further on the "hypothetically correct jury charge," and in so doing comment on how continuous sexual abuse charges should be submitted to the jury. The jury charge issue, in my view, gets to the core issues that arise time and again in continuous sexual abuse cases.

The facts here tread the very borderline between speculation and reasonable inferences.[23] This is chiefly because the time P.S. spent in the green house straddles the dateline between when she was thirteen, and any offense against her would fall within the scope of Section 21.02, and when she had turned fourteen, at which point any offense would fall beyond the reach of

---

[23]This is not the first time this Court has been presented with facts testing the borderline between reasonable inferences and speculation in a continuous sexual assault case. *See Witcher v. State*, No. 06-20-00040-CR, 2020 WL 7483953, at *1 (Tex. App.—Texarkana Dec. 21, 2020) (mem. op., not designated for publication), *rev'd and remanded by* 638 S.W.3d 707 (Tex. Crim. App. 2022). *Hooper v. State* is perhaps the best articulation of how reasonable inference and speculation come uncomfortably close at the dividing line. *See Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007). There, the Texas Court of Criminal Appeals instructed, "A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Id.* Whatever words one chooses for the converse of "not . . . completely unreasonable," the implication is that there can be some measure of reasonableness, even in speculation. *Id.* Ultimately, as the majority holds, the test is whether there was enough evidence for a rational jury to have "found the essential elements of the crime beyond a reasonable doubt." *Id.* at 15 (citing *Jackson*, 443 U.S. at 318–19; *Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006); *Guevara*, 152 S.W.3d at 49).

40

Section 21.02.  While there was testimony about events in the green house, there was no direct testimony addressing when each of the multiple events at the green house fell on that timeline. Additionally, there was no direct testimony establishing the "30 days or more" requirement of Section 21.02(b)(1)(2) regarding the events in the green house.  TEX. PENAL CODE ANN. § 21.02(b)(1)(2).

There was, however, testimony of a clear starting point within the scope of Section 21.02. That was the telephone-call incident shortly after the return from Houston to the green house.  In addition, P.S. testified that Balderas sexually assaulted her "whenever" she went down the stairs in the green house to do laundry or to go to what at some unspecified point in time became her room.  "[W]henever" could be when P.S. was thirteen, or when she was fourteen, or both.  To conclude that subsequent events were both thirty days after the telephone-call incident but still before P.S. turned fourteen, the jury would have to draw some inferences from the testimony about the event(s) at the steps to the laundry room.  The jury's verdict indicates that they drew inferences that those events met the time parameters of Section 21.02.  I believe there was sufficient evidence for the jury to draw such inferences.  I agree that the testimony of P.S. regarding the events at the steps to the laundry room does not fall squarely and directly within the time requirements of Section 21.02.  But neither can it be said that the testimony conclusively describes incidents outside of those time parameters.[24]

---

[24]Which is to say I do not see the testimony as compelling the jury's verdict to be set aside.  In *Witcher*, the Texas Court of Criminal Appeals affirmed a continuous sexual assault conviction even though there was "give or take" and "around that time" testimony regarding the date of the first instance of sexual abuse.  *Witcher*, 638 S.W.3d at 710. In my view, the Texas Court of Criminal Appeals found that testimony sufficient in two ways.  First, the Texas Court of Criminal Appeals examined, and determined, the temporal meaning of the testimony in context.  *Id.*

41

The majority concludes that, because the time P.S. spent in the green house straddles the dateline between when she was thirteen and when she had turned fourteen, and because the State offered no direct testimony to put those events within Section 21.02, there is insufficient evidence to draw any inference at all regarding the timing of those events. In short, the State did not carry its burden. Were it not for *Witcher*, I would be inclined to agree.

In light of *Witcher*'s affirmance of a continuous sexual assault conviction despite vague temporal testimony, my view is that a reasonable jury could find that the "whenever" testimony about the stairwell incidents was just barely enough from which a jury could reasonably infer that one or more stairwell incidents happened thirty or more days after the phone call, but before P.S. turned fourteen. Put another way, setting aside the jury's verdict has the effect of saying that the only reasonable conclusion that a jury could come to is that there was the telephone-call incident (combined perhaps with stairwell events within the next twenty-nine days) and that, thereafter, Balderas left P.S. alone until she turned fourteen. On the testimony in this trial, I do not view that as a conclusion that can be imposed on this jury. Again, though, I emphasize the closeness of this matter, for reasons expressed in the majority's analysis.

---

(finding the testimony to mean "June 10th or at worst a few days afterwards"). Second, and relatedly, the Texas Court of Criminal Appeals found that "give or take" and "around that time" did not describe a start date in conflict with the jury's verdict. *Id.* ("Given the context of the testimony, 'around' *could not have meant* sixteen days or more later" (emphasis added)). Thus, in *Witcher*, the Texas Court of Criminal Appeals found that the testimony in that case, understood in context, "could not have" described events outside the time parameters of the offense. The present case, therefore, is different. On the one hand, the testimony in this case could describe events *outside* of the time parameters of the offense. That is reason to find, as this Court's majority does, that this case falls on the speculation side of *Witcher*. On the other hand, the testimony in this case, though imprecise, could also describe events *within* the parameters of the offense. It is for that reason I return to the overarching question of *Witcher*, namely, whether "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 709–10 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

42

Because I would remand for a new trial on the continuous sexual abuse charge, I briefly address Balderas's point about the jury charge. The charge to this jury was not consistent with this Court's decision in *Lewis v. State*, No. 06-21-00021-CR, 2022 WL 630288, at *1 (Tex. App. Texarkana—Mar. 4, 2022, pet. ref'd) (mem. op., not designated for publication), *cert. denied*, No. 22-6098, 2023 WL 192044 (U.S. Jan. 17, 2023). The State implicitly concedes as much by urging us to "re-consider" *Lewis*. I see no reason to revisit *Lewis*. Nor do I see the majority's hypothetically-correct-jury-charge analysis as revisiting *Lewis.*

At the core, the State's argument against *Lewis* is of a piece with the State's contention that time is not a material element of a Section 21.02 charge. In *Lewis*, this Court followed the decisions of our sister courts in Houston First District and in Amarillo by requiring the jury to be charged on the temporal relationship of the "first and last act" consistent with the requirements of Section 21.02. *Smith v. State*, 340 S.W.3d 41 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Turner v. State*, 573 S.W.3d 455, 461–63 (Tex. App.—Amarillo 2019, no pet.).

By asking that *Lewis* be reconsidered, the State is, in my view, asking that the statutory requirements of Section 21.02 be rendered a practical nullity. In the view of the State, the jury need not unanimously agree on "the dates as to when Balderas committed his 'first and last acts of sexual abuse' for the 30-day period of duration." More broadly, the State cites to *Dixon v. State* for the remarkable proposition that "time was not a material element for this offense." *See Dixon v. State*, 201 S.W.3d 731, 736 (Tex. Crim. App. 2006). *Dixon*, however, *predates* Section 21.02 of the Texas Penal Code and, indeed, may very well have prompted the Texas Legislature to create Section 21.02. *Dixon*, 201 S.W.3d at 736–37. What is more, the Texas Legislature can,

43

by its words, make time a material element of an offense. *Garcia v. State*, 981 S.W.2d 683, 686 n.4 (Tex. Crim. App. 1998) ("It is possible, of course, for time to be made material by the definition of an offense."). That is what the Texas Legislature did with the words of Section 21.02.

I suspect that clarity on the jury charge regarding continuous sexual abuse charges might prompt more direct testimony on the temporal requirements which, in turn, might reduce the frequency with which continuous sexual abuse cases tread the borderline between reasonable inference and speculation.

The issue was recently before the Texas Court of Criminal Appeals. *Smith*, *Turner*, and *Lewis* were recently considered by the Fourteenth District Court of Appeals in Houston. *Pelcastre v. State*, 654 S.W.3d 579, 587 (Tex. App.—Houston [14th Dist.] 2022. pet. ref'd). In *Pelcastre*, the Fourteenth Court suggested that the issue of the jury charge in continuous sexual assault cases was ripe for consideration by this State's highest court. *Id.* at 588 n.4. Petition, however, was refused, which leaves in place the decision of our sister court. Regarding the jury charge, the majority in *Pelcastre* noted the conflicting decisions on how to charge the jury in continuous sexual abuse cases, but ultimately decided that there was no harm. *Id.* at 588 ("At the very least, the appellate courts' conflicting decisions about whether the language in the application paragraph before us is sufficiently confusing to constitute charge error counsels in

favor of proceeding to a harm analysis.").[25]  Accordingly, I see nothing in *Pelcastre*, or the refusal of petition in *Pelcastre*, that compels us to revisit *Lewis*.

Jeff Rambin
Justice

Date Submitted:     January 18, 2023
Date Decided:      May 25, 2023

Do Not Publish

---

[25]Notably, the *Pelcastre* court was able to conclude that, if there was charge error, it was not harmful.  The *Pelcastre* court was able to do so because, in that case, there was concise testimony addressing the temporal elements of the offense.  *Id.* at 584 ("Q.  And that happened for more than thirty days?  A.  Yes.").